AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

**FILED**

**Sep 10, 2020**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

In the Matter of the Search of )
)
THE PERSON OF GONZALO RUIZ )
GARCIA, DOB XX/XX/1965 )
)
)

Case No.   2:20-sw-0814-CKD

# SEALED

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

## SEE ATTACHMENT A-3, attached hereto and incorporated by reference.

located in the _____ Eastern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

## SEE ATTACHMENT B-3, attached hereto and incorporated by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 846, 841(a)(1) | Conspiracy, possession with intent to distribute, and distribution of controlled substances |
| 18 U.S.C. § 922(a)(1)(A) | Dealing in firearms without a license |
| 18 U.S.C. § 922(g)(1) | Felon in possession of a firearm |

The application is based on these facts:

## SEE AFFIDAVIT, attached hereto and incorporated by reference.

☑ Continued on the attached sheet.

☐ Delayed notice _____ days (give exact ending date if more than 30 _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/

*Applicant's signature*

Nate Cernat, Special Agent, FBI

*Printed name and title*

Sworn to me and signed telephonically.

Date:  9/10/2020 at 3:21 pm

*Judge's signature*

City and state:  Sacramento, California

Carolyn K. Delaney, U.S. Magistrate Judge

*Printed name and title*

**AFFIDAVIT IN SUPPORT OF APPLICATIONS UNDER RULE 41 FOR WARRANTS TO SEARCH AND SEIZE AND UNDER RULE 4 FOR WARRANTS TO ARREST**

I, Nathan G. Cernat, being first duly sworn, hereby depose and state as follows:

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the following people, premises, and property:

| Attachment | Person/Property | Mentioned in Paragraph # |
|---|---|---|
| **TARGET SUBJECTS** | | |
| A-1 | Michael Garcia, DOB XX/XX/1988 ("**MICHAEL**") | Throughout |
| A-2 | Nancy Dalila Escobar Garcia, DOB XX/XX/1989 ("**NANCY**") | Throughout |
| A-3 | Gonzalo Ruiz Garcia, DOB XX/XX/1956 ("**GONZALO**") | 60, 63, 65, 68, 69, 71, 72, 79, 123 |
| A-4 | Tylor Jeffery Combs, DOB XX/XX/1980 ("**COMBS**") | 88, 98, 103-1113, 119, 134, 123 |
| A-5 | Dale Alan Douglas, JR, DOB XX/XX/1990 ("**DOUGLAS**") | 7 (fn 1), 32-41, 57, 61, 74, 87, 93, 95-98, 100, 116, 118 |
| A-6 | King James Barberan Miranda, DOB XX/XX/1988 ("**MIRANDA**") | 57, 79, 81-84, 87, 91, 93, 102, 122 |
| **TARGET RESIDENCES** | | |
| A-7 | 1 Tristan Circle, Sacramento, CA 95823 ("**MICHAEL'S SACRAMENTO RESIDENCE**") | 19, 31, 43,  48-50, 77,-79, 94, 95, 99, 117 |
| A-8 | 4325 San Juan Avenue, Fair Oaks, CA 95628 ("**DOUGLAS RESIDENCE**") | 7 (fn 1), 41, 96, 97, 116 |
| A-9 | 7158 S. Camino Secreto, Tucson AZ 85746 ("**MICHAEL'S TUCSON RESIDENCE**") | 54, 55,  61, 62, 93, 121 |
| A-10 | 3650 Tallyho Drive, APT 16, Sacramento, CA 95826 ("**GONZALO'S RESIDENCE**") | 65, 68, 69, 120 |
| A-11 | 2563 Chuck Yeager Circle, Sacramento, California 95834, ("**MIRANDA'S RESIDENCE**") | 81, 83, 93, 122 |
| A-12 | 2120 Quail Ranch Court, Elverta, CA 95626 ("**COMBS' STASH HOUSE**") | 104, 111, 119 |
| A-13 | 8549 Brisenbourg Way, Antelope CA 95843 ("**COMBS' RESIDENCE**") | 112, 113 |
| **TARGET VEHICLES** | | |
| A-14 | 2015 Dodge Charger bearing the California License Plate 8JZZ121, ("**NANCY'S VEHICLE**") | 9, 13, 23, 24, 29, 31, 44, 45, 61, 62, 86, 103, 117, 118, 121 |
| A-15 | 2019 Tesla bearing the California License Plate 8KPN085 ("**DOUGLAS' VEHICLE**") | 33, 34, 39, 41, 116 |
| A-16 | 2011 Cadillac Escalade bearing the California License Plate 7LET766 ("**MICHAEL'S VEHICLE**") | 62, 71, 92 |
| A-17 | 2003 Infinity bearing the California License Plate #5HGL992 ("**MIRANDA'S VEHICLE**) | 82, 83, 122 |
| A-18 | 2001 Chevy Camaro bearing the California License Plate 8DDN599 ("**COMBS' VEHICLE #1**") | 111, 113 |
| A-19 | 2007 Blue Chevy Tahoe Bearing the California License Plate #8DVW037 ("**COMBS' VEHICLE #2**") | 112, 113 |

These people and property are further described in Attachments A-1 through A-19.  The applications seeks to search them for the things described in Attachment B-1 through B-19.  As explained throughout this affidavit, and specified on the relevant attachments, I believe these target subjects above are engaged in all or a combination of the following offenses: conspiracy to distribute, and to possess with intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1); felon in possession of a firearm, in violation of 18 § U.S.C. 922(g)(1); and illegal firearms trafficking, in violation of 18 U.S.C. § 922(a)(1)(A).  This affidavit also supports my application for arrest warrants of **MICHAEL, NANCY, GONZALO,** and **COMBS** for the offenses listed on the applications for arrest warrants.

## I.      INTRODUCTION AND AGENT BACKGROUND

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI).  As such, I am an "investigative or law enforcement officer" within the meaning of 18 U.S.C. § 2510(7), in that I am an officer of the United States empowered by law to conduct criminal investigations and make arrests for offenses enumerated in 18 U.S.C. § 2516.  I have been employed with the FBI since April 2015.  I am currently assigned to the FBI's Sacramento Division, Fairfield Resident Agency, where I work as part of the FBI's Solano County Violent Crime Task Force.  In this role, I am responsible for investigating a variety of criminal matters, to include violent criminal enterprises such as street gangs and organized crime

3.      I was trained as an FBI Special Agent at the FBI Academy in Quantico, Virginia.  During my training, I received training in Title 21 of the United States Code, including Sections 841(a)(1) and 846.  During my employment as an FBI Special Agent, I have participated in numerous criminal investigations.  I have also participated in numerous investigations involving the use of federal and state search warrants to collect evidence, including controlled substances, the seizure of narcotics-related records, and other types of evidence that document the activities of criminal organizations in both the manufacturing and distribution of controlled substances and weapons.  To successfully conduct these investigations, I have utilized a variety of investigative techniques and resources including physical and electronic surveillance, various types of infiltration (including informants and cooperating sources), pen register and trap and trace devices, telephone tracking devices, mail covers, pole cameras, stationary video recording vehicles, wire intercepts, audio and audio/video recording devices.

4.      Through these investigations, my training and experience, and conversations with other agents and law enforcement personnel, I have become familiar with the methods used by organized criminal enterprises, drug trafficking organizations, and street gangs to smuggle and safeguard controlled substances and weapons, to distribute, manufacture, and transport controlled substances, and to collect and launder related proceeds.

5.      I am aware, from training and experience, that individuals engaged in drug trafficking commonly use coded language to refer to drugs and drug transactions.  Drug traffickers specifically use coded language in an effort to evade law enforcement by seemingly concealing the true nature of their discussions and actions.

6.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant and does not set forth all of my knowledge about this matter.

## II.      PROBABLE CAUSE

7.      The United States government, and the FBI specifically, is investigating **MICHAEL GARCIA** ("**MICHAEL**") and **NANCY GARCIA** ("**NANCY**"), and other identified and unidentified targets, for suspected drug and arms trafficking in the Eastern District of California.  On October 31, 2019, a confidential source (the CS)[1] reported that **MICHAEL**, also known as "Smokes," and his wife

---

[1] The CS is being paid for her/his information.  The CS has been convicted of the following offenses: carry loaded firearms in a public place, possession of an assault weapon, kidnapping, assault on person with firearm.  In 2012, the CS was sentenced to 12 years in the California State Prison.

The CS has been arrested, but not convicted, for the following offenses:  robbery, false imprisonment with violence, and assault with a deadly weapon (not a firearm), sale of tear gas weapon, possession of marijuana for sale, cultivating marijuana, possession of destructive device, burglary, robbery, carjacking, false imprisonment with violence, threatening crime with intent to terrorize, assault with a firearm, and felon in possession of a firearm.

The CS does not have any criminal history or convictions of perjury.  The CS has been an informant for the FBI since October of 2019 and has been proven to be a reliable CS.  The CS's reporting has been proven to be truthful and has been independently verified by FBI agents.

As discussed in this affidavit, while employed by FBI as a confidential source during this investigation the CS 1) purchased a boat from **MICHAEL** that **MICHAEL** told him used to belong to his (**MICHAEL's**) drug source and 2) the CS used methamphetamine with **MICHAEL** during this investigation.  According to the CS, this occurred when s/he met **MICHAEL** and **DOUGLAS** at **DOUGLAS' RESIDENCE.**  The CS reported that because **MICHAEL** wanted to show the CS multiple firearms for sale at DOUGLAS' residence.  While at the residence, **DOUGLAS** had several of his

**NANCY**, reached out to her/him and offered to provide heroin and methamphetamine for resale in Solano County. The CS reported that **MICHAEL** distributes narcotics and firearms in Sacramento, California. The CS further reported that although **MICHAEL** was then still incarcerated at the Tulare County Jail for drug-related offenses, **NANCY** was distributing narcotics on **MICHAEL's** behalf. The CS reported that **NANCY** is distributing methamphetamine and heroin at the direction and guidance of **MICHAEL**.

### *November 7, 2019:*
### *Controlled Buy of One Pound of Methamphetamine from NANCY GARCIA, Discussion of Firearms Sales*

8.      On November 7, 2019, the CS purchased one pound of methamphetamine from **NANCY** for $1,900. Prior to the buy, the CS and **NANCY** had talked by phone and coordinated the specifics for the deal, including the time and meeting place, as well as the quantity and sale price. This buy was surveilled by undercover law enforcement, and the controlled buy itself was surreptitiously recorded. The CHS's vehicle and person were searched by law enforcement for contraband both before and after the controlled buy.

9.      The CS called **NANCY** before the meeting and agreed to meet in the Sam's Club parking lot in Vacaville, California. Surveillance units were in place when the CS arrived there. These units saw **NANCY'S VEHICLE** and **MICHAEL'S VEHICLE** at the residence, arrive, and park next to the CS's car. Surveillance units observed the CS exiting out of his/her vehicle and entering **NANCY**'s vehicle.

10.      During their brief meeting, **NANCY** told the CS that she brought her/him a "P" (i.e., a pound). The CS agreed to pay **NANCY** $1,900 within one or two weeks. **NANCY** told the CS she would be willing to bring the CS more drugs the next time they met. **NANCY** told the CS, "over there everybody started doing the Fentanyl." **NANCY** told the CS that her supplier asked her if she wants Fentanyl and she said "no." **NANCY** told the CS she didn't want to take Fentanyl because the sentences

---

associates there who were smoking methamphetamine. **MICHAEL** and **DOUGLAS** were smoking methamphetamine as well. According to the CS, because the CS refused to use methamphetamine, **DOUGLAS'** associates started asking the CS if s/he was working with law enforcement. **MICHAEL** told the CS that s/he had to smoke some methamphetamine to prove that s/he was not working with law enforcement. The CS reported that s/he used methamphetamine on this occasion because s/he was in fear of his/her life and smoked meth to appease MICHAEL and his associates. According to the CS, this occurred on August 1, 2020. The CS did not report this until August 4, 2020. Notably, the case agent did a phone debrief with the CS on August 2, 2020, and the CS did not report the drug use at the time.

for distributing Fentanyl are higher than heroin.  The CS asked **NANCY** to get her/him a quarter pound of "Black" (i.e., heroin).  **NANCY** replied, "They shoot me whatever I want."  **NANCY** told the CS, "I will see if the dude has dark (i.e., heroin) and I will get it for you."

11.     During this meeting **NANCY** told the CS that **MICHAEL** was controlling the price for the narcotics.  The CS asked **NANCY** if s/he could get better prices for meth if the CS would pay upfront with cash and if the CS would purchase several pounds at a time.  **NANCY** responded "Yeah.  Smokes (**MICHAEL**) said yeah."  **NANCY** also told the CS that their source asked **NANCY** to tell **MICHAEL** "not to dirty his hands anymore" when **MICHAEL** gets out of jail because there are "other people that can do that for you."  During the meeting, **NANCY** mentioned to the CS that she (**NANCY**) has a scheduled video visit with **MICHAEL** later that evening.

12.     During this buy, the CHS asked **NANCY** if **MICHAEL** had any "bangers" for sale. **NANCY** replied that **MICHAEL**'s brother had "sold them all" and that she only had two, which were hers.  The following exchange occurs:

| | | |
|---|---|---|
| NG: | What do you want? |
| CS: | Just sumthin small for, you know what I mean. |
| NG: | Yeah like a revolver or... |
| CS: | No... uh not a revolver, like an automatic or something |
| NG: | Okay |
| CS: | You know maybe like a Glock or uhhh something like that. A Smith Wesson automatic or something |
| NG: | That's what I have, uh I have a Smith Wesson 45 |
| CS: | Yeah that's a . . .   what you got.  You got the compact? |
| NG: | I got a. Fuck I don't even have it on.  I try to not bring it both at the same time. |
| CS: | Yeah you know. . . |
| NG: | (laughs) |
| CS: | Yeah.  That's a bad thing. |
| NG: | Uh what do you call it?  Uh but no uh I'll tell him cause he has his boy that fucking has a bunch of them and I should talk to him. |

13.     When the transaction was complete, the CS got out of **NANCY'S VEHICLE** and got

back into his/her car.  At that point, both parties left.

14.     The CS met with agents afterwards and turned over the package **NANCY** had given him/ her.  The suspected methamphetamine was weighed using a digital scale, and its approximate weight was 486.4 grams.  Subsequent laboratory testing confirmed the purity of the methamphetamine to be 98%.

15.     Later the same evening, **NANCY** had a video visit with **MICHAEL**, who at the time was in custody at the Tulare County Jail.  During the video call, **NANCY** told **MICHAEL** "I seen your, uh, your boy, [the CS' prison handle]."  **MICHAEL** and **NANCY** continued talking about the CS and **MICHAEL** stated "That's good" …. So you went shopping, huh?"  **MICHAEL** later asked **NANCY** "How long were you up at the outlets?"  **NANCY** said she was at the outlets for a short time. **MICHAEL** asked **NANCY** who she went with and who the CS came with.  **NANCY** replied that both **NANCY** and the CS were alone.  **MICHAEL** asked **NANCY** "You checked on him?" and **NANCY** replied "Yah I did."

16.     Later during the same jail call, **NANCY** started talking in coded language and told **MICHAEL** that the CS "wants a three-hundred" (i.e. heroin)[2].  **MICHAEL** replied "Oh, those things are nice, but…"  **NANCY** continued "We sold our three-hundred [i.e., heroin] hella long ago and we haven't got another one."  **MICHAEL** stated "we should have saved them like a V-6."  **NANCY** agreed and told **MICHAEL** that was exactly what the CS wanted.  **MICHAEL** told **NANCY** to go to the "auction" and see "Cheng."  **NANCY** replied that she had already talked to "Cheng" but that he (Cheng) "let his friend borrow it."  **MICHAEL** seemed surprised and stated "Hell, nah.  Why- why would he?  He lent him the fu- he lent him the whole three-hundred?"

17.     On November 21, 2019, the CS reported that **NANCY** told the CS that she (**NANCY**) would not be able to supply heroin or Fentanyl until the CS will discuss it in person with **MICHAEL**. **NANCY** told the CS that she picked up two kilos of Fentanyl from her supplier two weeks prior to their conversation but **MICHAEL** asked her to take it back because **MICHAEL** did not want **NANCY** to deal

---

[2] On February 4, 2020, the CS reported that NANCY told the CS she uses the code term "three hundred" (meaning Chrysler 300) for heroin and "Cadillac" for methamphetamine.  As further expanded in this affidavit, on April 3, 2020, the CS reported that MICHAEL asked the CS to talk in code when they discuss illegal drug trade on the phone.  MICHAEL told the CS that they would refer to a drug shipment as a "car" and a "Cadillac" would mean methamphetamine while a "300" (Chrysler) would mean heroin.

with Fentanyl.  **NANCY** told the CS that **MICHAEL** would have to authorize **NANCY** to sell the CS heroin or Fentanyl.

*November 25, 2019:*
*Controlled Buy of Two Pounds of Methamphetamine from NANCY, Continued Discussion of*
*Firearms Sales*

18.     On November 25, 2019, the CS bought two pounds of methamphetamine from **NANCY** for $3,800.  They discussed the specifics for the deal in advance via telephone conversation.  The CS was going to pay for one pound up front and **NANCY** was going to front the CS a second pound, which the CS would pay for later.  **NANCY** had fronted the CS one pound of methamphetamine on November 7, 2019 and expected to be paid for that pound as part of this current transaction.  This buy was surveilled by undercover law enforcement, and the controlled buy itself was surreptitiously recorded on audio and video.  The CS's vehicle and person were searched by law enforcement for contraband both before and after the controlled buy.

19.     The deal was set to take place in the parking lot of the Vacaville Premium Outlets. Surveillance units were already in place at the meeting location when the CS arrived.  Earlier that day, a separate surveillance team had set up at **NANCY**'s residence located at 1 Tristan Circle, Sacramento, CA ("**MICHAEL'S SACRAMENTO RESIDENCE**").  The surveillance team saw **NANCY** coming and going from **MICHAEL'S SACRAMENTO RESIDENCE** throughout the day.  **NANCY** traveled from **MICHAEL'S SACRAMENTO RESIDENCE** to the meeting location under constant surveillance.

20.     The same day before the meeting with the CS, **MICHAEL** called **NANCY** from Tulare County Jail.  **NANCY** told **MICHAEL** that she was 100 percent certain she was currently being followed.  **NANCY** told **MICHAEL** she was driving to and from a location when she noticed a vehicle following her.  **NANCY** also told **MICHAEL** that she noticed a vehicle make the same U-turn she made. **MICHAEL** then told **NANCY** to "stay home."  **NANCY** agreed but told **MICHAEL** she was supposed to go to the outlets to go shopping.  **MICHAEL** stated, "I don't know," and **NANCY** replied, "I don't know."

21.     Minutes later, **MICHAEL** called **NANCY** again from the Tulare County Jail. **MICHAEL** asked **NANCY** how it looked now and what they were driving.  **NANCY** told **MICHAEL** she saw a blue/grey SUV following her.  **MICHAEL** asked **NANCY** if she was still going to go to the

outlets and **NANCY** replied by asking **MICHAEL** if she should still go to the outlets.  **MICHAEL** told

**NANCY** "If you want to, it's up to you."

22.     **MICHAEL** called **NANCY** again and asked **NANCY** if she was going shopping and

**NANCY** stated, "Yes."  Just minutes later, **MICHAEL** called **NANCY** and told her (**NANCY**) that if he

(**MICHAEL**) is unable to get out of his cell to call her he will have his bunk mate call her to make sure

she gets home safely.

23.     **NANCY** arrived at the Vacaville Premium Outlets driving **NANCY'S VEHICLE**.

**NANCY** parked her vehicle near the Shoe Palace store.  She and a small child got out of the car and went

inside.  The CS called **NANCY** to ask where she was.  Moments later, **NANCY** and the child came out

and she called the CS asking where s/he was parked.  **NANCY** got back in her car and drove around the

parking lot, and eventually parked next to the CS's car.

24.     After she parked, the CS got out of his/her car and entered **NANCY'S VEHICLE**.  The

CS asked how old the child was, and **NANCY** said the child was seven years old.  **NANCY** gave the CS

the suspected methamphetamine and the CS gave her $3,800 ($1,900 for the first pound, and $1,900 for

the pound she had fronted the CS on November 7).  The CS asked about buying a gun.  **NANCY** said she

could talk to a contact who had many firearms, but she wanted to talk to "Smokes" (**MICHAEL**) first to

see who he wanted her to go through, since she knew several gun dealers.

25.     The discussion between the CS and **NANCY** during the transaction revealed that

**MICHAEL** was dictating what kind of drugs **NANCY** should order and distribute.  The CS and

**NANCY** spoke in coded terms about heroin ("black" or "dark"), methamphetamine ("care"), and

Fentanyl.  **NANCY** told the CS that she and "Smokes" are in debt for more than $60,000 for three

"kicks" (i.e., kilograms) of heroin.  **NANCY** told the CS that she had fronted someone three "kicks" two

months prior.  The next day, **NANCY** called that person's phone and found out he had been arrested by

the police.  **NANCY** said that the person who supplied her with the "kicks" would still supply her, but

she had to talk to "Smokes" (**MICHAEL**) before she did anything.  **NANCY** told the CS that "Smokes"

(**MICHAEL**) did not want to order heroin until the debt for the heroin seized was paid off.

26.     After the deal was complete, the CS returned to his/her car and both parties left.  The CS

met with agents later and gave them the two pounds of suspected methamphetamine, which weighed

8

1  approximately 998.0 grams.  Subsequent laboratory testing revealed that the purity of this

2  methamphetamine to be 98%.

3      27.     After the meeting, **MICHAEL** called **NANCY** from the Tulare County Jail and asked

4  **NANCY** if she was already home.  **NANCY** replied, "Yes."  **MICHAEL** asked **NANCY** if she went

5  shopping and she replied, "Yeah."  **MICHAEL** said, "Good, good."

6                           *December 11, 2019:*
   *Meeting with NANCY Garcia***, Payment for the November 27 Controlled Buy, and Continued**
7                    **Discussion of Firearms Sales**

8      28.     On December 11, 2019, the CS negotiated to purchase two guns from **NANCY** for

9  $1,500.  As noted above, **NANCY** had fronted the CS with one pound of methamphetamine on

10 November 25, 2019 and she also expected to be paid $1,900 for that pound as part of this transaction.

11 However, about one hour before they were supposed to meet, **NANCY** called the CS and said that she

12 couldn't sell her/him the guns that day.  Nonetheless, **NANCY** and the CS agreed to meet in Vacaville so

13 that the CS could pay **NANCY** the $1,900 for the methamphetamine she fronted the CS on November 25.

14 This meeting was surveilled by undercover law enforcement and recorded.

15     29.     **NANCY** and the CS agreed to meet at the Vacaville Premium Outlets parking lot, near the

16 Nike Outlet Store in Vacaville.  Surveillance units saw **NANCY'S VEHICLE** arrive at the Nike Outlet

17 store and park.  The CS got into **NANCY'S VEHICLE** and told the CS that she (**NANCY**) would give

18 the CS the direct contact information for her (**NANCY**'s) gun supplier, who went by the moniker "Boo

19 Boo" (later identified as Dale **DOUGLAS**).  During this meeting, **NANCY** told the CS that **MICHAEL**

20 did not want the CS to visit him at the Tulare County Jail so that there was no record of the CS and

21 **MICHAEL** linking together.  **NANCY** told the CS that usually she (**NANCY**) deals with the drug

22 supplier and **MICHAEL** distributes the drugs locally.

23     30.     During this meeting, the CS asked **NANCY** what would be the price for a pound of

24 methamphetamine if the CS would buy five or ten pounds and pay with cash.  **NANCY** said, "Let me talk

25 to Smokes (**MICHAEL**) because he is the one putting in numbers."  **NANCY** offered to bring the CS

26 two or three pounds of methamphetamine the following week.

27     31.     Shortly afterwards, the CS got out of **NANCY'S VEHICLE** and both parties left.

28 Surveillance units followed **NANCY** from Vacaville back to **MICHAEL'S SACRAMENTO**

                                        9

1   RESIDENCE.

2                        *January 16, 2020:*
                 *Controlled Buy of Two Firearms from Dale Douglas*
3

4        32.     On January 16, 2020, the CS purchased two firearms from an unknown Hispanic male

5   adult who went by "Boo Boo," later identified as **DALE ALAN DOUGLAS, Jr** ("**DOUGLAS**").  The

6   contact between **DOUGLAS** and the CS was facilitated by **NANCY**.  The CS had asked **NANCY** about

7   purchasing firearms on past controlled buy/walk deals and **NANCY** put the CS in contact with

8   **DOUGLAS** for any firearms transactions.  The price of the firearms had been previously negotiated by

9   **NANCY** and the CS via a telephone conversation**.  DOUGLAS** agreed to sell the CS two handguns for a

10  total of $1500.  This buy was surveilled by undercover law enforcement, and the buy was recorded.  The

11  CS's vehicle and person were searched for contraband both before and after the controlled buy.

12       33.     The transaction was set to take place in the parking lot of the Vacaville Premium Outlets

13  in Vacaville, CA 95687.  FBI surveillance units had already been established in the parking lot prior to

14  the meeting between **DOUGLAS** and the CS.  Before the meeting, the CS contacted **DOUGLAS** and

15  provided his/her location.  **DOUGLAS** arrived in the parking lot and parked next to the CS. **DOUGLAS**

16  was driving a custom blue 2019 Tesla bearing California License Plate 8KPN085 (**"DOUGLAS'**

17  **VEHICLE"**).  A records check of the license plate showed the vehicle to be registered to a S. P. at 4325

18  San Juan Avenue, Fair Oaks, CA (**"DOUGLAS RESIDENCE"**).  Surveillance later suggested S.P. is

19  DOUGLAS' domestic partner.

20       34.     **DOUGLAS** exited the driver's side of **DOUGLAS' VEHICLE** and opened the trunk of

21  the vehicle.  **DOUGLAS** retrieved an unknown type of bag from the trunk and then entered the passenger

22  seat of the CS' vehicle.  **DOUGLAS** asked the CS if s/he wanted to get in his (**DOUGLAS'**) vehicle to

23  inspect the firearms because his vehicle had dark tinted windows and the CS agreed.  The CS and

24  **DOUGLAS** exited the CS' vehicle and entered **DOUGLAS' VEHICLE**.

25       35.     The CS inspected the two firearms and paid **DOUGLAS** $1500 for both firearms, as

26  previously agreed.  After completing the transaction, **DOUGLAS** and the CS discussed additional

27  firearms deals in the future.  **DOUGLAS** told the CS that he (**DOUGLAS**) had access to more firearms

28  and would be able to supply more firearms in the future.  The CS continues by telling **DOUGLAS** that

the hard part for her/him was the driving because the CS was on parole.  The CS told **DOUGLAS** that s/he used to be a gunsmith but now s/he was outdated because s/he (the CS) "just did ten."  The CS later told **DOUGLAS** that he used to have a permit to carry a firearms but then they "raided" his/her residence and took it away.  The CS told **DOUGLAS** that s/he (the CS) "did a two-year term on it."

36.   The CS also asked **DOUGLAS** about purchasing black tar heroin.  **DOUGLAS** told the CS that he has access to black tar heroin and that the CS could potentially purchase it from him in the future.  They then discussed prices related to how much **DOUGLAS** would sell it for.  **DOUGLAS** told the CS that he (**DOUGLAS**) could supply the CS with heroin for $700 per ounce.  Later the following exchange occurs:

CS   Man I need a good fucking plug on some black man.

DD   I'll be uh, in…I'll be in the bay area until Monday.

CS   Yeah?

DD   Yeah so just if, uh-

CS   [Overlapping Voice] Can I hit you up, uh-

DD   [Overlapping Voice] Let me know, um, like, tomorrow and then I-I'll just take something with me.

CS   It'll pro-it probably won't be till later in the week.  I got, I just grabbed something.

DD   Oh okay.

CS   I got, I got a plug for some, some weight, but it's not-the quality's not there, and I would rather have a little bit better quality.

DD   Yeah, it's uh…

CS   You know what I mean?  And pay a little bit more.

DD   [Overlapping Voice] But, but was their stuff good before because every year like when it gets to, to Christmas time, I mean even Nancy will tell you…

CS   [Overlapping Voice] Yeah?

DD   Eh, the plug.  Everyone goes to Mexico, so, when they go, it's like…  [scoffs] they're gone.  And you, so you know you have to stock up-

CS   [Overlapping Voice] Right.

11

1    DD      -that's what a lot of people don't do and then-

2    CS      Just starts getting cut, huh?

3    DD      -So yeah, if they're starting to get a little bit at a time, tha-the-that then they're fucked

4    because if they're grabbing a couple keys-

5    CS      [Overlapping Voice] Why you think that is?  That-that it-it gets bad after-after Christmas?

6    DD      Cause all-all the, everybody goes to Mexico.

7    CS      Oh, okay.

8    DD      That's where…all-all the plugs go to Mexico.  [Laughs]

9        37.      **DOUGLAS** told the CS that the firearms belonged to him (**DOUGLAS**) and that he

10   (**DOUGLAS**) would report the firearms as stolen.  **DOUGLAS** continued by explaining the CS that he

11   wanted to sell two firearms because it was better to report two guns stolen instead of just one.

12       38.      **DOUGLAS** told the CS that he could supply the CS with Glock pistols and high capacity

13   magazines that hold 17 or 30 rounds.  **DOUGLAS** told the CS "my Glocks are no serial numbers at all."

14   **DOUGLAS** told the CS that at one point he (**DOUGLAS**) was in possession of a Glock pistol with a 50

15   round "drum" magazine.  **DOUGLAS** also told the CS that he used to go at every single gun show to

16   "stock up ammo" and "stock up guns."

17       39.      When the transaction was complete, the CS exited **DOUGLAS' VEHICLE** and went

18   back into his/her vehicle.  The CS left the parking lot and was under constant surveillance as s/he drove

19   back to a predetermined meet location.  Agents took custody of the two firearms from the CS.  The first

20   firearm was a .40 caliber Springfield XD handgun, serial #XD346396.  The second firearm was a .40

21   caliber Smith and Wesson P40 Shield, serial #HKM3797.

22       40.      FBI surveillance units followed **DOUGLAS** from the meeting location as he was headed

23   towards Sacramento, CA.  While **DOUGLAS** was driving on highway 80 East bound back toward

24   Sacramento, a marked CHP unit conducted the traffic enforcement stop on **DOUGLAS** for a suspended

25   registration, no front license plate, and dark tinted front windows on the front windows.  The CHP officer

26   confirmed **DOUGLAS'** identity with his California Identification Card. **DOUGLAS** was confirmed to be

27   the only occupant inside the vehicle (**DOUGLAS'** identity had been unknown up until this point).

28   **DOUGLAS** had introduced himself to the CS as "Boo Boo."  A records check revealed that **DOUGLAS**

had a suspended California driver's license.  The CHP officer informed **DOUGLAS** of his suspension and advised him that he could not drive.  The stop was then terminated and **DOUGLAS** was released.

41.    **DOUGLAS** parked his vehicle at a Shell station and went inside a McDonalds. Approximately 30 minutes later a female arrived as a passenger in another vehicle.  Surveillance units identified the female as S.P from the DMV photo of the registered owner of the **DOUGLAS' VEHICLE.**  S.P. entered the driver's seat of **DOUGLAS' VEHICLE** and **DOUGLAS** entered the passenger seat.  Surveillance units followed **DOUGLAS** and S. P. to an apartment on Smoketree Drive, Sacramento, CA.  A California DMV records check on **DOUGLAS** revealed that **DOUGLAS** listed **DOUGLAS' RESIDENCE** as his mailing address since November of 2019.  On 01/30/20, FBI surveillance units monitored the activities at both **DOUGLAS' RESIDENCE** and the apartment on Smoketree Drive.  Surveillance units observed **DOUGLAS' VEHICLE** parked at **DOUGLAS' RESIDENCE.**  S.P. was observed picking up children from school and returning back to **DOUGLAS' RESIDENCE**.  Later in the day, S.P. accompanied by three children arrived at the apartment located on Smoketree Drive, Sacramento, CA.  Later S.P. was observed departing the apartment located on Smoketree Drive, Sacramento alone in **DOUGLAS' VEHICLE.**

### *January 23, 2020*
### **Controlled *Buy of One Pound of Methamphetamine from NANCY***

42.    On January 23, 2020, the CS bought one pound of Methamphetamine from **NANCY** for $1,900.  **NANCY** set up the details of the transaction with the CS in advance via telephone conversation. The controlled buy was surveilled by law enforcement, recorded, and the CS's vehicle and person were searched for contraband both before and after the meeting with NANCY.

43.    The transaction was set to take place in the parking lot of the Vacaville Premium Outlets near Vacaville, CA 95687.  FBI surveillance units were set up at the meeting location before the CS met **NANCY**.  Earlier that day, a separate surveillance team had set up at **NANCY**'s residence (**MICHAEL'S SACRAMENTO RESIDENCE**).  The surveillance team saw **NANCY** coming and going from **MICHAEL'S SACRAMENTO RESIDENCE** throughout the day.

44.    Before the meeting with the CS, surveillance units saw **NANCY'S VEHICLE** arrive in the vicinity of the Nike Outlet store.  Surveillance units observed **NANCY** driving through the Vacaville

13

Premium Outlets parking lot before parking in a neighboring parking lot in front of the Coach Outlet Store.  Later **NANCY** drove past the location where the CS was parked and parked in front of Claire's Outlet Store.  **NANCY** was seen exiting **NANCY'S VEHICLE** with an unidentified small child and walking into the Claire's Outlet Store.

45.     Surveillance units observed **NANCY** exit Claire's with the small child and enter **NANCY'S VEHICLE**.  **NANCY** drove to the same parking lot as the CS and parked in front of the Nike Store.  The CS walked over to **NANCY'S VEHICLE** and completed the transaction.  **NANCY** gave the CS the one pound of suspected methamphetamine and the CS gave her $1,900.

46.     While driving from Claire's Outlet Store to the Nike Store, **NANCY** called the CS and told her/him that something was not right and wanted to complete the transaction quick.  **NANCY** told the CS that she believed she saw law enforcement near one of the outlet stores.

47.     After the deal was complete, the CS returned to his/her car and both parties left.  The CS met with agents later and gave them the one pound of suspected methamphetamine, which weighed approximately 499.8 grams.  This methamphetamine later tested at a purity of 99%.

*February 12, 2020:*
*Canceled Order of Five Pounds of Methamphetamine from NANCY Garcia*

48.     On February 12, 2020, agents tasked the CS to call **NANCY** at a pre-established time and order five pounds of methamphetamine in efforts to determine if **NANCY** was using **MICHAEL'S SACRAMENTO RESIDENCE** as a stash house.  Surveillance units were monitoring **NANCY**'s activities when the CS called **NANCY**.  **NANCY** told the CS that she would be able to supply the five pounds of methamphetamine for $1700 per pound, and agreed to deliver the narcotics to Vacaville, CA the same day.

49.     The surveillance units monitored **NANCY** coming and going from **MICHAEL'S SACRAMENTO RESIDENCE** throughout the day.  **NANCY** went to stores and picked up children from school but did not go to any locations where she could have taken the narcotics from.  **NANCY** called the CS before she left **MICHAEL'S SACRAMENTO RESIDENCE** to confirm that the CS was able to make it to the meeting.  **NANCY** told the CS that she needed a confirmation because she needed to go pick the drugs up.  The CS confirmed the transaction.  **NANCY** started driving towards Vacaville

14

from **MICHAEL'S SACRAMENTO RESIDENCE** and did not stop anywhere to pick up a package.

50.     Agents tasked the CS to cancel the transaction when **NANCY** reached Davis, CA. **NANCY** returned directly to **MICHAEL'S SACRAMENTO RESIDENCE** under constant surveillance.  Based on my training and experience, the fact that **NANCY** was able to start driving from **MICHAEL'S SACRAMENTO RESIDENCE** with five pounds of methamphetamine on the same day of the order without going anywhere where she could have picked up the narcotics indicates that **NANCY** was potentially using **MICHAEL'S SACRAMENTO RESIDENCE** as a stash house for illegal drugs.

51.     Later the same day, **NANCY** spoke with **MICHAEL** at the Tulare County Jail.  **NANCY** told **MICHAEL** that she was mad that the CS canceled when she was already on her way.  **MICHAEL** seemed upset and told **NANCY** that the CS was about to be cut off.  Later the same evening **MICHAEL** and **NANCY** have another conversation.  **MICHAEL** asked **NANCY** if she knew the reason why the CS canceled the transaction.  **NANCY** told **MICHAEL** that the CS said h/she had an emergency. **MICHAEL** told **NANCY** that makes him angry.

### *Pertinent Activity in March and April 2020*

52.     On March 2, 2020, the CS reported that **NANCY** moved to Tucson, Arizona.  **NANCY** told the CS that **MICHAEL** and **NANCY** purchased a house in Tucson, AZ. **NANCY** told the CS that **MICHAEL** signed paperwork to be released on probation in Arizona.

53.     On March 4, 2020, agents contacted Tulare County Jail regarding **MICHAEL**'s release from custody.  Agents learned that **MICHAEL** was scheduled to be released from custody on March 24, 2020.  **MICHAEL** was scheduled to be released to the Tulare County Probation Department.

54.     Agents contacted the Tulare County Probation Department regarding **MICHAEL**'s release from custody.  According to the Tulare County Probation Department, on March 2, 2020, **MICHAEL** submitted a request to transfer his supervision upon release to the State of Arizona. **MICHAEL** provided the address of 7158 S. Camino Secreto, Tucson AZ 85746 (**MICHAEL'S TUCSON RESIDENCE**) as his proposed residence of record.

55.     On April 3, 2020, the CS reported that s/he met with **MICHAEL** and **NANCY** in person

15

at **MICHAEL'S TUCSON RESIDENCE**.  According to the CS, **MICHAEL** and **NANCY** live there

with their daughter.  This was also later confirmed by surveillance.  The CS reported he observed a small

stash of methamphetamine at **MICHAEL'S TUCSON RESIDENCE**.  Additionally, the CS reported

that **MICHAEL** showed the CS the location where he hides a small amount of methamphetamine.  The

CS reported that **MICHAEL** buried the methamphetamine in the backyard of **MICHAEL'S TUCSON**

**RESIDENCE** under a pile of bricks next to a doghouse.

56.    According to CS reporting, the following conversation occurred in summary: **MICHAEL**

told the CS that he has a direct connection to a drug source.  **MICHAEL** told the CS the shipments of

heroin have a Cobra insignia imprinted on top of the one-kilogram heroin packages.  **MICHAEL** told the

CS that he (**MICHAEL**) uses a secure phone line to order drugs his drug source.  **MICHAEL** told the

CS that he has not set up any shipment routes in Arizona yet but he was working on setting up shipment

routes for Arizona as well.  **MICHAEL** told the CS that he (**MICHAEL**) was planning to continue

selling drugs in the Sacramento area.

57.    **MICHAEL** offered the CS to supply her/him with methamphetamine or heroin.

**MICHAEL** told the CS that if s/he wanted methamphetamine it would have to be at least 10 to 15

pounds minimum and if the CS wanted heroin, it would have to be one kilogram minimum.  **MICHAEL**

told the CS that an "Asian dude" (later identified as **JAMES MIRANDA**) would deliver the drugs.

**MICHAEL** requested the CS to provide a location where the CS wanted the drugs to be delivered.

**MICHAEL** told the CS that there would be no cash exchange when the drugs will be delivered.

**MICHAEL** told the CS he would always front the drugs and **DOUGLAS** would pick up the cash later.

**MICHAEL** told the CS that once the CS placed an order of drugs, within about a week **MICHAEL**

would let the CS know when the drugs were available.  **MICHAEL** told the CS that he (the CS) would

have to pick up the shipment of drugs within 24 hours.

58.    According to the CS, **MICHAEL** provided the CS a burner phone to be used exclusively

for the drug trade business.[3]  **MICHAEL** instructed the CS to keep the phone off at all times.

**MICHAEL** told the CS that he (**MICHAEL**) will contact the CS on his/her regular phone and ask the

---

[3] The CS has shown me this phone.

CS to call back on the burner phone. **MICHAEL** instructed the CS to drive away from his/her house, then turn the phone on and call **MICHAEL**. **MICHAEL** asked the CS to talk in code when they discuss illegal drug trade on the phone. **MICHAEL** told the CS that they would refer to a drug shipment as a "car" and a "Cadillac" would mean methamphetamine while a "300" (Chrysler) would mean heroin.

59. **MICHAEL** gave the CS advice on how to hide the drugs. **MICHAEL** instructed the CS to purchase a PVC pipe with threaded end caps, store the drugs inside the PVC pipe, and bury it somewhere in the backyard. **MICHAEL** told the CS that it works best if the CS could bury the PVC pipe containing the drugs in somebody else's backyard, someone that the CS trusts.

60. **MICHAEL** told the CS that he (**MICHAEL**) was supplying his father (later identified as **GONZALO GARCIA**) with methamphetamine. **MICHAEL** told the CS that his father receives shipments of 10 to 15 pounds of meth at a time and sells them for profit.

61. The CS reported that **DOUGLAS** was also present when **MICHAEL** was instructing the CS at **MICHAEL'S TUCSON RESIDENCE**. **MICHAEL** told the CS that **DOUGLAS** was his (**MICHAEL's**) drug runner. Both **MICHAEL** and **DOUGLAS** were using methamphetamine at **MICHAEL'S TUCSON RESIDENCE** while the CS was there. The CS asked **DOUGLAS** why he (**DOUGLAS**) ended contact with the CS back in January of 2020. **DOUGLAS** told the CS he (**DOUGLAS**) blocked the CS' number because after the meeting when **DOUGLAS** sold the CS the two firearms, he (**DOUGLAS**) was pulled over by police. **DOUGLAS** continued that he believed that law enforcement was tampering with **NANCY'S VEHICLE** and **DOUGLAS** believed that somebody had been compromised. **DOUGLAS** wanted to make sure that the CS was not compromised.

62. On April 14, 2020, FBI surveillance units observed **MICHAEL, NANCY**, and a small child at **MICHAEL'S TUCSON RESIDENCE**. FBI surveillance documented **NANCY** and the small child entering the residence. **NANCY'S VEHICLE** was parked in front of the residence. Surveillance units observed **MICHAEL** driving a 2011 Black Cadillac Escalade bearing the California License Plate 7LET766 (**MICHAEL'S VEHICLE**). Surveillance units observed **MICHAEL** parking **MICHAEL'S VEHICLE** inside of the attached garage of **MICHAEL'S TUCSON RESIDENCE**.

1

2

*April 20, 2020:*
*Controlled Buy of One Pound of Methamphetamine from MICHAEL's Father*

3      63.     On April 20, 2020, the CS bought one pound of methamphetamine from **GONZALO**

4   **RUIZ GARCIA** ("**GONZALO**") for $1,900.  This controlled buy was surveilled by law enforcement,

5   recorded, and the CS's vehicle and person were searched both before and after the buy.

6      64.     **MICHAEL** brokered the transaction and provided the CS step-by-step instructions

7   regarding the transaction.  **MICHAEL** has previously told the CS that he (**MICHAEL**) supplied his

8   father with about 10 to 15 pounds of methamphetamine per month.  On April 19, 2020, the CS called

9   **MICHAEL** with agents present to discuss the transaction.  **MICHAEL** instructed the CS to call him

10  (**MICHAEL**) on April 20, 2020, right before the CS will be ready to drive to Sacramento to pick up the

11  narcotics.  **MICHAEL** told the CS that he (**MICHAEL**) would tell the CS where to go and would

12  facilitate the meeting between the CS and his father.  **MICHAEL** told the CS to give his father $100 for

13  his time.  **MICHAEL** told the CS to pay him (**MICHAEL**) $1,800 for the one pound of

14  methamphetamine at a later day.  **MICHAEL** did not provide any identifying information or a contact

15  number for his father.

16      65.     FBI support stuff conducted a commercial and law enforcement database checks to

17  identify **MICHAEL**'s father.  Based on information obtained from CLETS, CLEAR, and CA DMV, FBI

18  analysts were able to identify **GONZALO**, residing at 3650 Tallyho Drive, APT 16, Sacramento, CA

19  (**"GONZALO'S RESIDENCE"**)**,** as **MICHAEL**'s father.

20      66.     On April 20, 2020, the CS called **MICHAEL** with agents present.  **MICHAEL** instructed

21  the CS to start driving towards Sacramento and call him (**MICHAEL**) back when the CS would be in the

22  vicinity of South Watt avenue exit on Highway 50.  **MICHAEL** told the CS that he (**MICHAEL**) would

23  text the CS the address for the meeting location with his father.

24      67.     The CS drove to a predetermined location in the vicinity of South Watt exit on Highway

25  50 in Sacramento and called **MICHAEL**.  **MICHAEL** sent the CS the following address: 9210 Keifer

26  Blvd., Sacramento via text, and told the CS it was a 7-Eleven gas station near his father's apartment

27  complex.  **MICHAEL** told the CS to turn right once the CS is passed the 7-Eleven and it would be the

28  first apartment complex on the right side.  **MICHAEL** told the CS to give him (**MICHAEL**) a call once

the CS arrives because his father lives in a gated apartment complex.

68.     The CS traveled from the predetermined location to the apartment complex as instructed by **MICHAEL**, under constant surveillance.  FBI surveillance units had been pre-established in the vicinity of **GONZALO'S RESIDENCE.**  Surveillance units had positively identified **GONZALO** going in and out of **GONZALO'S RESIDENCE** before the CS arrived at the apartment complex.

69.     The CS called **MICHAEL** when s/he arrived at the apartment complex and **MICHAEL** told the CS where to park.  **MICHAEL** told the CS to wait inside his/her vehicle.  Surveillance units observed **GONZALO** exit **GONZALO'S RESIDENCE** carrying a white, plastic grocery bag with red coloring on it.  **GONZALO** walked all the way to CS's vehicle, opened the passenger door, reached inside, and then walked away no longer holding the white grocery bag with red coloring.  **GONZALO** returned to **GONZALO'S RESIDENCE** and was not seen again.

70.     After the transaction was complete, the CS called **MICHAEL** and confirmed the completion of the transaction.  The CS meet with agents later and gave them the one pound of suspected methamphetamine.  The total weight of the suspected methamphetamine including packaging weighed approximately 499.4 grams.  This methamphetamine was later tested at a laboratory and confirmed to be 98% pure.

### *May 7, 2020*
### *Recorded meeting with MICHAEL and NANCY Garcia*

71.     On May 7, 2020, the CS met **MICHAEL** and **NANCY** to pay **MICHAEL** $1800 for the one pound of methamphetamine supplied by **MICHAEL** on April 28, 2020 through **GONZALO**.  The meeting took place in the parking lot of the Nut Tree Plaza located at 1661 E. Monte Vista Avenue, Vacaville, CA.  **MICHAEL** and **NANCY** arrived in **MICHAEL'S VEHICLE** at the meeting with the CS.  The CS had previously coordinated the time and location of the meeting with **MICHAEL** over the phone.  **MICHAEL** had previously told the CS that he (**MICHAEL**) might bring the CS another pound of methamphetamine at the meeting.

72.     During the meeting the CS gave **MICHAEL** $1800 to pay for the one pound of methamphetamine provided to the CS on April, 28, 2020, by **GONZALO**.  **MICHAEL** told the CS that he was not able to bring any additional drugs because he (**MICHAEL**) was in short supply due to the

closure of the border with Mexico.  **MICHAEL** told the CS that there was a shortage of methamphetamine in the area which caused the prices of methamphetamine to increase to approximately $2400 per pound.

73.    During this meeting **MICHAEL** offered to supply the CS with one kilogram of heroin.  **MICHAEL** told the CS that s/he would have to take the entire kilogram of heroin.  **MICHAEL** told the CS that he (**MICHAEL**) would have to come back from Arizona to receive the drugs and will let the CS know when to pick it up.

74.    During the conversation, the CS told **MICHAEL** that h/she has somebody else that transports the drugs for the CS.  The following exchange occurred:

MG: Is he good though?  Your boy's cool, for sure?

CS: Well, you ain't never going to see him, yeah.

MG: No, Bro, I'm saying don't trust him.

CS: Um, yeah, hell yeah, I'll follow him, yeah.  He ain't going to get away from me, you know what I mean?

MG:  Yeah, no, no, I'm just saying.

CS: I fuck with him all my whole life, it's all good.

MG: Oh, okay, okay.  [Unintelligible] some Boo-Boo (**DOUGLAS**) type of deal. [Unintelligible].  Look at you trust this n*****.

CS: Yeah, I mean, I'm responsible for it once it's, you know what I mean, don't worry

MG: Yeah, yeah, but if it's not [Unintelligible], Bro. [Unintelligible] I don't want to lose shit right off the bat, that would be bad and fuck my line off.

75.    The CS and **MICHAEL** discuss the possibility of **MICHAEL** connecting the CS with **MICHAEL**'s firearms supplier.  **MICHAEL** told the CS he will reach out to an individual who could provide "Glocks."  The following exchange occurred:

MG: Alright.  I- I- I'll ask for the Glocks.

CS: Yeah?

MG: Yeah, I'll tell you what it is.  [Unintelligible]

CS: Or even if there's something else.

MG: We going to be like a forty or a forty-five, but they charge from eight to nine hundred, full, but they always have thirty rounds.

CS: And- in- anything special, like, fucking silencers, fucking [Phonetic Pronunciation] pillatos.  I'll pay fucking top dollar for it, if they're, like, done right, you know what I mean?

MG: What about AKs?

CS: Yup.  Hell, yeah.  If they're nice, though, I mean.

***May 18, 2020:***
***Controlled Buy of One Quarter Kilo of Heroin from James MIRANDA***

76.    On May 11, 2020, **MICHAEL** contacted the CS and asked if the CS would be willing to accept two kilograms of heroin instead of one.  **MICHAEL** told the CS that one kilogram would be for the CS to sell and the other one for somebody else.  **MICHAEL** inquired if the CS would be able to keep the other kilogram of heroin for a while and later deliver it to somebody else on **MICHAEL**'s behalf.

77.    On May 15, 2020, **MICHAEL** told the CS that he (**MICHAEL**) was going to fly from Tucson, Arizona to Sacramento, CA that day to receive and distribute a shipment of heroin.  **MICHAEL** told the CS to be ready to receive one kilogram of heroin on May 15 or May 17, 2020.  **MICHAEL** later told the CS that the plan had changed and **NANCY** would travel to Sacramento instead of **MICHAEL.** **MICHAEL** told the CS that **NANCY** would meet the CS at **MICHAEL'S SACRAMENTO RESIDENCE** to give the CS the drugs.

78.    Later the same day, **MICHAEL** told the CS that both **MICHAEL** and **NANCY** decided to drive to Sacramento, CA. **MICHAEL** told the CS that he (**MICHAEL**) was going to receive four kilograms of heroin over the weekend.  **MICHAEL** told the CS that he **MICHAEL** would give the CS a call when **MICHAEL** is in possession of the heroin.  **MICHAEL** told the CS that the price of one kilograms of heroin was $27,000, and that the CS would have to pick the drugs up at the **MICHAEL'S SACRAMENTO RESIDENCE**.  **MICHAEL** instructed the CS to park in the driveway and he (**MICHAEL**) would help the CS hide the drugs in the vehicle.  **MICHAEL** told the CS that once the CS was done selling the drugs, he should bring the money to **MICHAEL'S SACRAMENTO RESIDENCE**.  **MICHAEL** told the CS that he (**MICHAEL**) has a safe at the **MICHAEL'S**

21

SACRAMENTO RESIDENCE where the cash proceeds of the drugs will be stored until MICHAEL or NANCY return to Sacramento to take the money.

79.     On May 17, 2020, MICHAEL told the CS that he (MICHAEL) was in possession of four kilograms of heroin.  At the direction of the FBI, the CS negotiated to purchase only one quarter kilogram for about $6750, instead of one kilogram.  MICHAEL told the CS to meet him MICHAEL at MICHAEL'S SACRAMENTO RESIDENCE on May 18, 2020, to pick up the heroin.  Later the same day, MICHAEL asked the CS to pick up the heroin on May 17, 2020, because he (MICHAEL) had to leave Sacramento that day.  Because the CS told MICHAEL s/he was not available to accept the drugs that day, MICHAEL offered to deliver the drugs to the CS' residence himself.  MICHAEL later told the CS that he would leave the heroin with either his father (GONZALO) or the "Asian Guy" (later identified as MIRANDA) who is one of MICHAEL's runners.  Shortly after the previous conversation, MICHAEL contacted the CS and confirmed that the "Asian guy" would meet the CS on May 18, 2020 to deliver the drugs.

80.     On May 18, 2020, MICHAEL told the CS that the "Asian guy" went by the moniker "Chino."  MICHAEL told the CS that Chino's name was MIRANDA and provided the CS with a telephone number to contact MIRANDA.  MICHAEL instructed the CS to call MIRANDA at the aforementioned phone number to coordinate the time and location to pick up the heroin.

81.     On the same day, FBI support stuff conducted open source, commercial, and FBI database checks on the aforementioned telephone number.  FBI analysts identified King James Berberan Miranda (MIRANDA), residing at 2563 Chuck Yeager Circle, Sacramento, California 95834, (MIRANDA's RESIDENCE) as the likely user of the phone number.  Toll records show multiple previous contacts between this number and both NANCY's and MICHAEL's known phone numbers.

82.     On May 18, 2020, the CS called MIRANDA with agents present and inquired about a meeting time and location to pick up the one quarter kilogram of heroin.  MIRANDA told the CS that he (MIRANDA) would text the CS a location for the meeting.  MIRANDA sent the CS following address: 4000 East Commerce Way, Sacramento, CA to the CS via text message.  Surveillance units were pre-established at the meeting location before the CS arrived at the location.  Surveillance units observed a 2003 black Infinity bearing the California License Plate #5HGL992, ("MIRANDA'S VEHICLE")

1    arrive in the parking lot of Natomas Food and Liquor.  FBI surveillance units identified **MIRANDA** as

2    the driver and the only occupant of the Infinity.

3          83.     The CS met **MIRANDA** in the parking lot of the aforementioned location and

4    **MIRANDA** gave the CS the suspected heroin on **MICHAEL**'s behalf.  The CS did not give **MIRANDA**

5    any money for the one quarter kilogram of heroin during this transaction because **MICHAEL** had agreed

6    to front the narcotics.  **MICHAEL** told the CS to pay him (**MICHAEL**) for the narcotics at a later day.

7    Shortly afterwards, the CS got out of **MIRANDA'S VEHICLE** and both parties left.  Surveillance units

8    followed **MIRANDA** from the parking lot of the Natomas Food and Liquor to **MIRANDA'S**

9    **RESIDENCE.**

10         84.     Agents met the CS after the meeting to take custody of the heroin and to conduct a CS

11   debrief.  Agents showed the CS a California DMV picture of **MIRANDA** without showing any other

12   identifying information.  The CS identified **MIRANDA** as the individual who delivered the one quarter

13   kilogram of suspected heroin.  Agents took custody of the presumptive heroin evidence.  The total weight

14   of the suspected heroin including packaging weighed approximately 258.3 grams.  The suspected heroin

15   was later confirmed as heroin by laboratory testing.

16

17   ***June 10, 2020:***
              ***Recorded Meeting with MICHAEL Garcia***

18         85.     On June 9, 2020, **MICHAEL** sent the CS a video depicting **MICHAEL** who was holding

19   a large amount of United States currency.  In summary, MICHAEL stated in the video that he was

20   "trapping" and stated "Sac money is good money."  Based on my training and experience, drug dealers

21   use the term" trap house" for a house they use to store their illegal drugs, and therefore, MICHAEL used

22   the term to tell the CS that he (MICHAEL) was located at a trap house.

23

24

25

26

27

28



FIGURE 1:  SCREENSHOT OF VIDEO MICHAEL SENT TO CS SHOWING HIM DRUG PROCEEDS

86.     On June 10, 2020, the CS met with **MICHAEL** at the Solano Mall located at 1350 Travis Blvd., Fairfield, CA.  It should be noted that **NANCY** came with **MICHAEL** at the meeting with the CS, but walked into the Solano Mall and was not present during the transaction.  **MICHAEL** and **NANCY** drove **NANCY'S VEHICLE** to the meeting with the CS.

87.     During this meeting, the CS paid **MICHAEL** $6750 for the one quarter kilogram of heroin that **MICHAEL** had fronted the CS on May 18, 2020, through **MIRANDA**.  **MICHAEL** told the CS that he (**MICHAEL**) was in Sacramento trying to sell drugs and collect money for the drugs **MICHAEL** distributed from last shipment of heroin.  The following exchange occurred:

MG      Yeah, fool, the black been selling crazy fool…  I run - I sold already three and a half kicks.

CS      Man, that's insane, dude.

MG      [Overlapping Voice]: Over these past two days.

CS      [Overlapping Voice]: Do you see how fuckin' bad they need fuckin' black up here.

MG      [Overlapping Voice]: Black is an odd commodity, fool.

CS      [Overlapping Voice]: I'm telling you, fool.

MG      [Overlapping Voice]: That shit is crazy.  These fools are moving it fast over there.  I don't even – they just showed – they just gave me the last one.  Last two – well, 'cause they gave me – they bought me three.  They bought me three uhh, like three days ago, two days ago, when I first

1     got here.

2     CS     Yeah?

3     MG     And then uh, and then – yeah, n****.  They're already gone, I got like a half of one left.

4     But, I was like dude, what's up?  Fool, we gonna fuckin'…

5     88.     The CS asked **MICHAEL** how much money he (MICHAEL) was holding in the video

6 that **MICHAEL** sent to the CS the day before.  **MICHAEL** told the CS it was about $70,000.  The

7 following exchange occurred:

8     CS     That – who pushes that much fuckin'… weight out here?

9     MG     Who?

10     CS     Um, the fuckin'…

11     MG     The Asian guy?

12     CS     …the Asian dude.  That's the whole fuckin' – all that cash is from him?

13     MG     Nah, hell nah!  Nah, nah.

14     CS     [Overlapping Voice]: I was gonna say that guy's gettin' it out here.

15     MG     Yeah, yeah, yeah.  No, no.  Hell no, he ain't got it like that.  No, that – that – nah I – I

16     went through uh, three different people to bundle up.  I went through T [later identified as

17     **COMBS**] fuckin' I sold T a kick.  I sold one of my other fuckin' Puerto Rican homies a – uh,

18     fuckin' like a half of P.  Fuckin' uh, oh Boo Boo [**DOUGLAS**] moved a fuckin' like.  He moved

19     like 10 zips over the weekend.  Fuckin'… yeah, I just broke it off.  I seen a bunch of people.  Like

20     people want that shit, I just gotta stop.  I – I got like a – I still gotta shit.  I still gotta go to West

21     and like, I got hella the motha fuckers gotta stop by.  Like they want black.

22     89.     **MICHAEL** told the CS that he was trying reinvest the drug proceeds to purchase more

23 drugs.  **MICHAEL** told the CS that he planned to buy at least 15 kilograms of heroin with the cash

24 proceeds from the prior heroin shipment.  **MICHAEL** stated, "I'm tryna buy a lot.  I'm tryna get like at

25 least 15 keys of black."

26     90.     **MICHAEL** told the CS that he was trying to buy a kilogram of "coke" (i.e. cocaine).

27 During this meeting, **MICHAEL** told the CS that "nobody" is producing methamphetamine in Mexico in

28 order to drive the price of meth up in the US.

91.     **MICHAEL** told the CS to reach out to him **MICHAEL** if the CS needed more heroin and that **MICHAEL** would coordinate with "Chino" (**MIRANDA**) to deliver the heroin to the CS. Michael told the CS that "Chino" (**MIRANDA**) has some "coke" if the CS wants to buy cocaine.

*Pertinent activity in July, 2020*

92.     On July 12, 2020, **MICHAEL** sent the CS a video depicting **MICHAEL** shooting an AR-15 rifle with a high capacity drum magazine.  **MICHAEL** told the CS that he (**MICHAEL**) has purchased the rifle from one of his cousins.

 

FIGURE 2: MICHAEL (A FELON) SHOOTING A FIREARM   /   MAGNIFIED IMAGE OF LICENSE PLATE OF MICHAEL'S VEHICLE

93.     On July 20, 2020, **MICHAEL** offered to sell the CS an AK-47 rifle for $900. **MICHAEL** sent a picture of the AK-47 rifle to the CS via text message.  **MICHAEL** told the CS that he (**MICHAEL**) decided to extend his stay in Sacramento, CA because he (**MICHAEL**) was waiting to receive a shipment of methamphetamine.  **MICHAEL** told the CS that he would take one pound of meth to Arizona and distribute the rest in Sacramento. Based on my training and experience, drug traffickers usually keep their drugs and the drug proceeds in areas that they control and have immediate access to it such as their vehicles and their residences. Based on that knowledge and experience, it is my opinion that **MICHAEL** stored the one pound of methamphetamine he (**MICHAEL**) told the CS he was taking to Arizona at **MICHAEL's TUCSON RESIDENCE.**



FIGURE 3:  AK 47 MICHAEL OFFERED TO SELL THE CS

94.     On July 23, 2020, **MICHAEL** told the CS that he (**MICHAEL**) had four pounds of methamphetamine and two kilograms of heroin available at **MICHAEL'S SACRAMENTO RESIDENCE**.  **MICHAEL** told the CS that he (**MICHAEL**) was breaking down the pounds of methamphetamine and selling one ounce two ounces at a time.  **MICHAEL** told the CS he was able to double the $4000.00 price per pound of methamphetamine by selling small amounts.

### *Pertinent activity in August, 2020*

95.     On August 2, 2020, **MICHAEL** offered the CS to broker a firearms transaction and asked the CS to meet him (**MICHAEL**) at **MICHAEL'S SACRAMENTO RESIDENCE**.  **MICHAEL** told the CS that **MICHAEL** and **DOUGLAS** would facilitate a meeting with the firearms supplier.  The CS met **MICHAEL** at **MICHAEL'S SACRAMENTO RESIDENCE** inside the attached garage of the residence.  The CS reported that part of the garage was converted to a bedroom while the rest of the space was used as garage/storage space.  Inside the garage bedroom, the CS saw about one pound of meth and some heroin along with a box of latex gloves and small plastic bags on top of the nightstand. **MICHAEL** offered to sell the CS methamphetamine and/or heroin.  **MICHAEL** told the CS that he (**MICHAEL**) has multiple kilograms of heroin available.  **MICHAEL** told the CS that the price of heroin was $11000 per pound and the price of methamphetamine was $3800 per pound.

96.     Later **MICHAEL** and the **CS** went to **DOUGLAS**' residence located at 4325 San Juan Ave, Fair Oaks, CA 95628 (**DOUGLAS' RESIDENCE**).  **MICHAEL** and the CS met with **DOUGLAS** in the backyard of the residence.  **DOUGLAS** told the CS that he (**DOUGLAS**) was not able to show the CS the firearms because he (**DOUGLAS**) had other people at the house.  **MICHAEL** showed the CS pictures of different firearms on **DOUGLAS**' phone.  **MICHAEL** showed the CS several AK-47 rifles,

AR rifles, a Thompson gun, and several different handguns.  **MICHAEL** did not have a picture of all the firearms together. **MICHAEL** told the CS that he (**MICHAEL**) would provide the CS with a list of firearms and the wholesale cost at a later day.

97.     While at **DOUGLAS' RESIDENCE**, **MICHAEL** showed the CS an area in the backyard of **DOUGLAS' RESIDENCE** where **DOUGLAS** hides illegal drugs.  **MICHAEL** told the CS that **DOUGLAS** conceals his illegal drugs in a PVC pipe and buries it in an area of the backyard that was overgrown with bamboo plants.  The CS took a picture of this area and shared it with case agent:



FIGURE 4:  PICTURE OF AREA IN DOUGLAS' RESIDENCE WHERE MICHAEL CLAIMED DOUGLAS STORES METHAMPHETAMINE

98.     The meeting took place in a detached guest house located in the backyard of the residence. **DOUGLAS** had five of his associates at the residence at the time the CS and **MICHAEL** was there. **DOUGLAS** and his associates were smoking methamphetamine in the guest house.  The CS reported **DOUGLAS** distributed the methamphetamine to the others, and that he (the CS) observed what appeared to be methamphetamine on top of a cabinet inside the guest house.  The CS saw approximately one quarter pound of methamphetamine in different smaller bags that were placed on top of the cabinet in plain view.  The CS also saw multiple plastic bags in various sizes, meth pipes, and a digital scale.  This is the same instance discussed in footnote one where the CS reported he used methamphetamine with **MICHAEL**, **DOUGLAS**, and the other men present.  The CS's report of drug use was delayed by three days.

*August 17, 2020:*
*Controlled Buy of 10 Firearms from MICHAEL GARCIA and TYLOR COMBS*



99.     On August 14, 2020, **MICHAEL** sent the CS pictures of 11 firearms and offered to sell them to the CS for $5000.00 as a wholesale transaction.  **MICHAEL** told the CS that he (**MICHAEL**) was sourcing the guns from one of his gun suppliers in Sacramento.  **MICHAEL** did not provide the CS with any contact information or identifying information for the firearms supplier.  **MICHAEL** told the CS that he **MICHAEL** was brokering the transaction for a profit margin of $1000.  Initially, **MICHAEL** told the CS that they would have to meet at **MICHAEL'S SACRAMENTO RESIDENCE** and then travel together to the residence of the gun supplier.

100.     On August 15, 2020, the CS reported that **MICHAEL** set up the meeting with the supplier of firearms for August 17, 2020.  **MICHAEL** told the CS that he **MICHAEL** would send the CS the address of the firearm supplier via text message on the day of the transaction.  **MICHAEL** told the CS to call him (**MICHAEL**) when the CS was on the way to Sacramento, CA and he would tell the CS where to go.  **MICHAEL** told the CS that he (**MICHAEL**) knows the firearms supplier through **DOUGLAS. MICHAEL** told the CS that he (**MICHAEL**) is supplying the individual who is the source of firearms with methamphetamine and heroin.

101.     On August 17, 2020, the CS called **MICHAEL** with Agents present and inquired about a location of the meeting with the firearms supplier.  This phone call was recorded by law enforcement. Initially **MICHAEL** told the CS they would probably meet in the vicinity of Arco Arena, in Sacramento CA.  Later **MICHAEL** called the CS and asked the CS to meet him (**MICHAEL**) in the vicinity of the Watt Avenue and Interstate 80 (I-80).  When the CS arrived in the vicinity of Watt Avenue and I-80,

MICHAEL sent the CS a text message with an address in Antelope, CA. **MICHAEL** asked the CS to meet him **MICHAEL** at this address.

102.    The CS met **MICHAEL**, **NANCY** and **MIRANDA** at the residence located in Antelope, CA. **MICHAEL** told the CS the aforementioned residence belongs to **MIRANDA.  MICHAEL** told the CS that **MIRANDA** was using the residence as a stash house for heroin.

103.    The CS, **MICHAEL,** and **NANCY** traveled to the residence of the firearms supplier under constant surveillance.  **NANCY** was leading the way to the location driving **NANCY'S VEHICLE. MICHAEL** and the CS followed **NANCY** to the location of the residence.  **NANCY** led **MICHAEL** and the CS to 2120 Quail Ranch Court, Elverta, CA ("**COMBS' STASH HOUSE**").  The firearms supplier introduced himself as "T" later identified by agents as **TYLOR JEFFREY COMBS ("COMBS").  COMBS** is a felon and so he is not allowed to possess firearms.

104.    **MICHAEL**, **NANCY**, **COMBS,** and the CS went inside what appeared to be a detached garage on the premises of the residence.  **MICHAEL** told the CS that the residence belonged to one of **COMBS'** friends.  **MICHAEL** told the CS that **COMBS** lives close by, just around the corner from the residence where the transaction took place.  **MICHAEL** told the CS that **COMBS** is using **COMBS' STASH HOUSE** as a stash house.  While parked in front of the residence, **MICHAEL** stated, "This is his boy's spot... where he keeps his money and shit."  Later **MICHAEL** added, "This is where he stashes his money," because "he don't want to keep at his house."

105.    **COMBS** was bringing the firearms into the garage from an unidentified location on the property.  **COMBS** made multiple trips because he (**COMBS**) was bringing several firearms at a time in the garage.  At one point in the conversation, the CS asked **COMBS** about a shotgun and inquired whether it is transferable or "hot."  **COMBS** replied that he did not think so, but that he did not know for sure.  The CS asked whether the guns were registered to **COMBS**.  **COMBS** replied that the SKS and another gun were from his "boy" and were not stolen.  **COMBS** then gestured, leaned forward, and added, "But this, and this, and this, and that, and the rest of them..."  The CS asked, "They're all hot?"  **COMBS** replied, "Yeah."

106.    The CS paid **MICHAEL** $1000 for setting up the transaction stating "Smokes, a thousand for you, my friend."  The CS paid **COMBS** $4000 for ten firearms.  The CS asked **COMBS** if he wanted

to count the money.  **COMBS** replied affirmatively, and did so.

107.    **MICHAEL** boasted to the CS, "This is all I used to do, is just set up deals like this."  The CS asked **MICHAEL** if he (**MICHAEL**) would set up some more deals for the CS.  **MICHAEL** stated that he (**MICHAEL**) may have another one.

108.    **COMBS** had additional firearms that he (**COMBS**) was not willing to sell.  **COMBS** showed the CS two "1911 Pistols" that **COMBS** was not willing to sell at the time.  At one point during the conversation, **COMBS** placed one of the 1911 pistols in his waist band.  **COMBS** stated that there is one "ten-twenty-two" that he is going to keep.  The CS asked whether **COMBS** was going to keep the stainless steel one and **COMBS** replied affirmatively.  Later, **COMBS** handed what appeared to be a handgun to the CS.  **COMBS** told the CS that he (**COMBS**) intended to keep the handgun.  The CS described the firearm as a Colt King Cobra .357.  The CS stated that .41 caliber is one of the few types of revolvers that are desirable anymore, **COMBS** stated that he had a "forty-one."

109.    During the recorded meeting, the CS told **COMBS** that when the CS was in his twenties, before the CS "caught a felony," the CS used to gunsmith and had a permit to carry a firearm.  The CS later added that s/he did two years in prison.  The CS tells a story of when the CS bought a 243 Weasel military vehicle with a "belt-fed nineteen-nineteen."  The CS then remarks, "That's when I could legally buy firearms and everything, though."

110.    Agents met the CS after the meeting and took custody of the firearms and ammunition provided by COMBS.  COMBS sold the CS the following firearms: Smith and Wesson revolver, serial number: 8K48566; NORINCO SKS rifle, serial number: 2400583; Auto Ordinance West Hurley, Thompson rifle, serial number: 5961; RAS47 rifle, serial number: RAS47100067; machine-gun, unknown manufacturer, no serial number; Ruger 10/22 rifle, serial number: 114-66114, Remington 742 rifle, serial number: B6921453; Maverick Arms 88 Shotgun, serial number: MV40375P; Benelli Nova Shotgun, serial number Z077147; Savage Arms 93R17 rifle, serial number:1558730.

111.    During the transaction, FBI surveillance units observed a 2001 Black Chevy Camaro bearing the California License Plate 8DDN599 ("**COMBS' VEHICLE #1**") parked in front of **COMBS' STASH HOUSE**.  A California DMV check revealed that the registered owner of the vehicle was **COMBS**.  Based on the video recording of the meeting, agents positively identified **COMBS** as the

1    individual who sold the CS the firearms.

2        112.    FBI support stuff conducted a California DMV query on **COMBS** and identified 8549

3    Brisenbourg Way, Antelope, CA ("**COMBS' RESIDENCE**") as a potential address for **COMBS**.  On

4    August 25, 2020, FBI agents conducted surveillance at **COMBS' RESIDENCE**, to confirm whether it

5    was **COMBS**'s residence.  Surveillance units observed **COMBS** at the residence entering and exiting the

6    garage while working on his 2007 Blue Chevy Tahoe Ca. License #8DVW037 ("**COMBS' VEHICLE**

7    **#2**") that was parked in the driveway.

8                    *Pertinent Activity in September, 2020*

9        113.    On September 1, 2020, FBI surveillance units observed **COMBS** working on **COMBS'**

10    **VEHICLE #2** in the driveway of **COMBS' RESIDENCE**.  **COMBS' VEHICLE #1** was parked in the

11    driveway of **COMBS' RESIDENCE**. Surveillance units observed **COMBS** departing **COMBS'**

12    **RESIDENCE** in **COMBS' VEHICLE #2.**

13        114.    On September 1, 2020, **MICHAEL** told the CS that he (**MICHAEL**) was receiving 30

14    pound shipments of methamphetamine per month from his drug source.  **MICHAEL** told the CS that

15    several weeks ago he (**MICHAEL**) received a 30 pound shipment of meth that was "stepped on" (i.e.

16    mixed with other substances) before the shipments arrived.

17        115.    On September 1, 2020, **MICHAEL** told the CS that he (**MICHAEL**) had about five

18    pounds of methamphetamine left from the prior methamphetamine shipment.  **MICHAEL** told the CS

19    that if the CS wants to purchase methamphetamine, h/she should probably wait until the next shipment of

20    meth due to the quality issues of the current shipment.  **MICHAEL** told the CS that he would be in

21    possession of another 30 pound shipment of meth next week.  **MICHAEL** told the CS that he

22    (**MICHAEL**) could sell the CS three to five pounds of meth at the wholesale price of $3500 per pound.

23    **MICHAEL** told the CS that he (**MICHAEL**) receives about 10 kilograms of heroin per month from a

24    different source.  Michael offered to sell the CS heroin.

25        116.    On September 3, 2020, agents conducted surveillance at **DOUGLAS' RESIDENCE**.

26    **DOUGLAS' VEHICLE** was parked in the driveway of the residence.  FBI surveillance units observed

27    **DOUGLAS** exiting **DOUGLAS' RESIDENCE** and departing in a 2002 white Ford Ranger, bearing the

28    California License Plate 22237G1. The vehicle had a white placard on the sides that displayed "Total

Lawncare and Pest Control." **DOUGLAS** was observed going to several properties and working on lawns.

117.    The same morning, one of the surveillance units conducted a spot check surveillance at **MICHAEL's SACRAMENTO RESIDENCE**. The surveillance unit observed **NANCY's VEHICLE** parked on the driveway of **MICHAEL's SACRAMENTO RESIDENCE.**

118.    Later the same day, surveillance units followed **DOUGLAS** to the 49 Truck Stop located at 2828 El Centro Road, Sacramento, CA. Surveillance units observed **DOUGLAS** pulling weeds on the premises of the Truck Stop.  Shortly after **DOUGLAS** arrived at the Truck Stop, surveillance units observed **NANCY's VEHICLE** in the parking lot of the truck stop.  The driver of **NANCY's VEHICLE**, later positively identified as **MICHAEL**, backed the vehicle in a parking spot where he could observe most of the parking lot traffic entering and exiting the business.  Based on my training and experience, drug traffickers often have one of their associates conduct countersurveillance activities to determine if they are being followed by law enforcement.  In this instance it appeared that **MICHAEL** was attempting to make sure that **DOUGLAS** was not being followed. **MICHAEL** was observed leaving the parking lot shortly after surveillance units observed **MICHAEL** in the parking lot.

119.    On September 7, 2020, **MICHAEL** told the CS that he (**MICHAEL**) recently met **COMBS** at **COMBS' STASH HOUSE** to conduct a drug transaction.  According to the CS, **MICHAEL** told him the following: **COMBS** gave **MICHAEL** $25,000 for a kilogram of heroin that was previously fronted by **MICHAEL** to **COMBS**.  **MICHAEL** gave **COMBS** another kilogram of heroin at the meeting.  **MICHAEL** told the CS that **COMBS** had about $110,000 to $120,000 in a box at **COMBS' STASH HOUSE** when **MICHAEL** was there.  **MICHAEL** told the CS that he (**MICHAEL**) gave **COMBS** a sample of heroin.  **COMBS** used the sample of heroin and was going in and out of consciousness while **MICHAEL** was there.  **MICHAEL** told the CS that he (**MICHAEL**) wanted to take the money and leave while **COMBS** was incapacitated due to the drug use.  **MICHAEL** told the CS that he (**MICHAEL**) ended up not taking the money but that the idea of conducting a robbery at **COMBS' STASH HOUSE** had crossed his mind.

120.    On September 8, 2020, surveillance units conducted a spot check surveillance in the vicinity of **GONZALO's RESIDENCE**. Surveillance units observed **GONZALO** departing

33

1  **GONZALO's RESIDENCE** and taking his car to an Auto Repair shop.

2      121.    On September 8, 2020, a different surveillance team conducted a spot check surveillance

3  on **MICHAEL's TUCSON RESIDENCE** in Tucson, AZ. Surveillance units observed **NANCY's**

4  **VEHICLE** parked in the driveway of the residence. The garage door of the residence way open and the

5  surveillance units observed **MICHAEL** and **NANCY** going in and out of the garage.

6      122.    On September 9, 2020, FBI surveillance units conducted a spot check surveillance at

7  **MIRANDA's RESIDENCE**.  **MIRANDA's VEHICLE** was observed parked across the street from

8  **MIRANDA's RESIDENCE**.  Later, FBI surveillance teams saw **MIRANDA** exit his residence, enter a

9  10 foot U-Haul truck parked on his driveway, and drive away.

10                    ***Felony Status of MICHAEL, COMBS, and GONZALO***

11      123.    I have reviewed the criminal history for all of the TARGET SUBJECTS.  **MICHAEL**,

12  **COMBS**, and **GONZALO** are convicted felons.  **MICHAEL** has a 2008 felony conviction for carrying

13  a loaded firearm in a public; a 2010 felony conviction for charges including transportation of controlled

14  substances, possession of a stolen vehicle, manufacture of machine guns, and felon in possession of a

15  firearm; and a 2019 felony conviction for possession of controlled substances for sale and transportation

16  of controlled substances.  He was sentenced to 116 months of incarceration for his 2010 conviction.

17  **COMBS** has a felony conviction for force/assault with a deadly weapon not a firearm, with GBI likely.

18  **GONZALO** has a 2006 felony conviction for possession of a controlled substance.

19       ***Training and Experience Regarding Drug/Firearm Trafficking and Drug/Firearms Traffickers***

20      124.    As a result of my training and experience, I know that the traffickers who deal in

21  controlled substances and firearms, or those that assist in that venture, maintain and tend to retain

22  accounts or records of those transactions.  Such records detail amounts outstanding, owed, or expended,

23  along with records tending to indicate the identity of the co-conspirators.  These records may be kept on

24  paper or contained in memory calculators or computers.  It is also my experience that these traffickers

25  tend to keep these accounts and records in their residences and in the areas under their control.  It is my

26  training and experience that in the case of drug dealers, evidence is likely to be found where the dealers

27  live.  It is also my training and experience that where criminal activity is long term or on-going,

28  equipment or records of the crime will be kept for some period of time.

125.   I have learned that large-scale drug and firearms traffickers often have on hand large amounts of United States currency in order to maintain and finance their ongoing business.  It has been my experience that drug traffickers often keep large sums of currency, caches of drugs, financial instruments, precious metals, jewelry, automobiles, and other items of value and/or proceeds of drug transactions related to obtaining, transferring, secreting or spending large sums of money acquired from engaging in in the acquisition and distribution of controlled substances in their residence or in the areas under their control.

126.   In my experience, drug traffickers commonly have in their possession, that is on their person, at their residence, and their vehicles, and in the areas under their control, firearms, included but not limited to handguns, pistols, revolvers, shotguns, rifles, machine guns, and other weapons.  Such firearms are used by criminals to protect their illicit trafficking operations, and themselves against law enforcement and others because the illicit drug and firearms trade is an inherently dangerous illegal activity involving large amounts of valuable contraband and drug proceeds.

127.   In my experience, traffickers commonly have in their possession, that is on their person, at their residence, and in their vehicles, and in the areas under their control and which they have free and ready access to drugs and firearms, which they intend to distribute.  It is my experience that these traffickers commonly utilize these areas (vehicles, residences, properties, etc.) as locations to conceal their narcotics from law enforcement.

128.   In my experience, traffickers may take or cause to be taken, photographs or videotapes of themselves, their associates, their property, and their product.  Such traffickers often maintain photographs and/or videotapes at their residence or in the areas under their control.

129.   In my experience, large scale traffickers often maintain in their possession and at their residence fictitious identification, including but not limited to, driver licenses, employment cards, insurance cards, social security cards, certificates of birth and passports which are obtained by the traffickers and utilized in an effort to prevent law enforcement identification of the traffickers and their drug trafficking activities.

130.   In my experience, drug traffickers often utilize vehicles in which to transport and distribute controlled substances in facilitation of their trafficking activities.  It has also been my

experience that traffickers will also utilize the vehicles as locations in which to store controlled substances and guns prior to distribution.  During prior investigations, I have observed that traffickers will often utilize vehicles registered in the names of individuals other than themselves in an effort to avoid detection by law enforcement.

131.    In addition, drug and gun traffickers often tend to attempt to legitimize their assets by establishing domestic and foreign businesses, by creating shell corporations, by utilizing foreign bank haven countries and attorneys specializing in drafting and establishing such entities employed to "launder" proceeds derived from the distribution of controlled substances.

132.    Individuals involved in the distribution of guns and drugs often make, or cause to be made, pictures videos, movies, compact discs, or other such items which are or contain photographic or digital images in order to memorialize their narcotics distribution, use, possession, or any other activities surrounding their trafficking activities, and that such items often identify co-conspirators in their trafficking activities.

133.    It has been my experience in the past, and particularly in this case, that when suspects use mobile phones to communicate with cooperating individuals or undercover agents to set up their illegal transactions, records relating to these activities will be found stored in the cellular telephone.

134.    I know that traffickers use mobile phones to communicate with one another, either by voice or text message.  Mobile phones preserve in their memory a history of incoming, outgoing, and missed calls, which can lead to evidence of the phone numbers of other traffickers and the dates and times that they and/or the mobile phone user dialed one another's telephones.  Mobile phones also contain in their memory a telephone book.  This allows the user to store telephone numbers and other contact information; the information stored in a phone used by a trafficker is evidence of the association of the trafficker, some of which is related to his or her illegal business.  Mobile phones also have a voice mail function that allows caller to leave a message when the user does not answer.  Traffickers sometimes leave voice messages for each other and this is evidence both of their mutual association and possibly their joint criminal activity.  Mobile phones can also contain other user-entered data files such as to-do lists, which can provide evidence of crime when used by a trafficker.  Mobile phones can also contain photographic data files, which can be evidence of criminal activity when the user was a trafficker who

36

took pictures of evidence of crime.

135.    As described in the Attachments A-1 through A-19, this affidavit seeks permission to search and seize things that are related to the drug and the firearms-trafficking activities between **MICHAEL**, **NANCY**, **DOUGLAS**, **MIRANDA**, **GONZALO**, **COMBS** and their co-conspirators and accomplices, in whatever form such things are stored.  Based on my training and experience, I know that electronic devices can store information for a long periods of time.  Even when a user deletes information from a device, it can sometimes be recovered with forensic tools.  Similarly, things that have been viewed via the Internet, are typically stored for some period of time on the device.  This information can sometimes be recovered with forensic tools.

136.    It is my opinion, based on my training and experience, and the training and experience of other law enforcement investigators to whom I have spoken, that the items listed in the respective Attachment B are items most often associated with the distribution of controlled substances as well as the proceeds from such illegal operations.

137.    Individuals involved in drug and gun trafficking also often maintain paraphernalia for packaging, weighing, cutting, testing, distributing, and identifying controlled substances.  Therefore, I am requesting authority to seize all items listed in Attachment B to this affidavit and incorporated here by reference.

### III.    COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

138.    As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

139.    *Probable cause.*  I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

    a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto

a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.   Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.   Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.   Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

140.   *Forensic evidence.  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:*

a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a

paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.  Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contains information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the

39

crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on

40

a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

141.    *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant.  In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

   a.   The time required for an examination.  As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable.  As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

   b.   Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

41

c.   Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

142.   *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

143.   Because several people appear to share some of the PREMISES as a residence, it is possible that the PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime.  If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

**IV.   <u>CONCLUSION</u>**

144.   I submit that this affidavit supports probable cause for a warrant to search the PREMISES described in each respective Attachment A and seize the items described in each respective Attachment B.

//

//

//

//

//

1

## V.    REQUEST FOR SEALING

2    145.    It is respectfully requested that this Court issue an order sealing, until further order of the

3    Court, all papers submitted in support of this application, including the application and search warrant.  I

4    believe that sealing this document is necessary because the items and information to be seized are

5    relevant to an ongoing investigation into the criminal organizations as not all of the targets of this

6    investigation will be searched at this time.  Based upon my training and experience, I have learned that

7    online criminals actively search for criminal affidavits and search warrants via the Internet, and

8    disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online

9    through the carding forums.  Premature disclosure of the contents of this affidavit and related documents

10    may have a significant and negative impact on the continuing investigation and may severely jeopardize

11    its effectiveness.

12

13                                                            Respectfully submitted,

14                                                            /s/

15                                                            Nathan G. Cernat
                                                             Special Agent
16                                                            FBI

17    Subscribed and sworn to me telephonically on:    9/10/2020 at 3:21 pm

18

19    The Honorable Carolyn K. Delaney
20    UNITED STATES MAGISTRATE JUDGE

21

22    /s/ Adrian T. Kinsella
       Approved as to form by AUSA ADRIAN T. KINSELLA

23

24

25

26

27

28

## ATTACHMENT A-3

## PERSON TO BE SEARCHED

Gonzalo Ruiz GARCIA

DOB XX/XX/1965

Address: 3560 Tallyho Drive, APT. 16, Sacramento, CA 95826.



California DMV photo, 2016.

## ATTACHMENT B-3

All records, information, evidence, contraband, fruits, or instrumentalities relating to violations of:

- 21 U.S.C. §§ 846, 841(a)(1) – Conspiracy, possession with intent to distribute, and distribution of controlled substances;

- 18 U.S.C § 922(a)(1)(A) – Dealing in firearms without a license; and

- 18 U.S.C. § 922(g)(1) – Felon in possession of a firearm and/or ammunition;

(the TARGET OFFENSES) those violations involving Michael GARCIA, Nancy GARCIA, Gonzalo GARCIA, Tylor COMBS, Dale DOUGLAS, James MIRANDA, and others (the TARGET SUBJECTS), and occurring after October 1, 2019, including:

1. Firearms, explosives, magazines, sights, silencers, other firearms/incendiary devices, and ammunition that may be used to facilitate the unlawful dealing in firearms by the TARGET SUBJECTS.

2. Controlled substances, including methamphetamine and heroin, or items frequently used to distribute controlled substances; drug-trafficking paraphernalia, including scales, measuring devices, and weighing devices; narcotics diluting or cutting agents; narcotics packaging materials, including plastic, tin foil, cellophane, jars, plastic bags, and containers; and plastic surgical gloves;

3. Bulk United States and foreign currency linked to drug-trafficking and/or the proceeds of drug trafficking;

4. Any boxes, bags, briefcases, suitcases or containers used to carry or conceal the items described in paragraphs 1, 2, and 3 of Attachment B-1.

5. All other items relating to the possession, maintenance and use of firearms including ammunition magazines, speed loaders, ballistic vests, spare firearms parts, holsters, cleaning kits, and all other documentation that relates to the possession, sale or transfer of firearms, including but not limited to photographs, receipts for the purchase or repair of firearms, firearm containers, carrying cases, and firearm boxes.

6. Documents, items, and indicia tending to establish the identity of persons in control of the premises/vehicles and/or things described in the warrants, including utility bills, rent receipts, canceled checks, bank and other financial statements and records, deposit receipts, passports, driver's licenses, social security cards, mail, automobile titles, and other identification, documents, land and lease titles, escrow papers, photographs, video and audio records, and keys

7. Narcotics or money ledgers, narcotics distribution or customer lists, narcotic supplier lists, correspondence, notations, logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics were purchased, possessed, transferred, distributed, sold or concealed;

8. Telephone paging devices, beepers, mobile phones, car phones, and other communication devices which could be used to participate in a conspiracy to distribute controlled substances in violation of the TARGET OFFENSES;

9. Gonzalo GARCIA's cellular telephone, with assigned phone numbers: 916-308-2045.

10. Bank account records, wire transfer records, bank statements, safety deposit keys and records, money wrappers, money containers, income tax returns, evidence of financial transfer, or movement of money generated from the sale of narcotics;

11. Personal telephone books, address books and other such address listings, letters, cables, telegrams, telephone bills, photographs, audio and video tapes connected to drug trafficking, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in drug trafficking activities;

12. Financial instruments purchased with large amounts of currency derived from the sale of controlled substances, including traveler's checks, bonds, stock certificates, cashier's checks and certificates of deposit; money counting machines, money wrappers and bags used to carry controlled substances;

13. Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds from the sale of controlled substances;

14. Records, items, and documents reflecting travel, including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to location;

15. All names, words, telephone numbers, email addresses, time/date information, message or other electronic data in the memory of the mobile telephone or on a server and associated with mobile telephones that are associated with the TARGET SUBJECTS during execution of the warrant.  The authority to search communication devices includes the following within each device:

    A. Call history (incoming, outgoing, missed);
    B. Text messaging history (incoming, outgoing, drafts);
    C. Contacts list;
    D. Data screen or file identifying the telephone number associated with the mobile telephone searched;
    E. Data screen, file or writing containing serial numbers or other information to identifying the mobile telephone searched;
    F. Voicemail;
    G. User-entered messages (such as to-do lists);
    H. Photographs;
    I. Any data in any application or form that contains evidence of the TARGET OFFENSES; and
    J. Any passwords used to access the electronic data described above.

For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

A.  evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

B.  evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

C.  evidence of the lack of such malicious software;

D.  evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

E.  evidence indicating the computer user's state of mind as it relates to the crime under investigation;

F.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

G.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

H.  evidence of the times the COMPUTER was used;

I.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

J.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

K.  records of or information about Internet Protocol addresses used by the COMPUTER;

L.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

M.  contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| | ) |
| THE PERSON OF GONZALO RUIZ GARCIA, | )   Case No.   2:20-sw-0814-CKD |
| DOB XX/XX/1965 | ) |
| | ) |
| | ) |

**SEALED**

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Eastern_____ District of _____California_____
*(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A-3, attached hereto and incorporated by reference.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B-3, attached hereto and incorporated by reference.**

**YOU ARE COMMANDED** to execute this warrant on or before _____9/24/2020_____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.      ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to: <u>any authorized U.S. Magistrate Judge in the Eastern District of California.</u>

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:      9/10/2020 at 3:21 pm            _Carolyn K. Delaney_
                                                                                      *Judge's signature*

City and state:        Sacramento, California              Carolyn K. Delaney, U.S. Magistrate Judge
                                                                                  *Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2) (modified)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

| Certification |
|---|

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

| _____ | _____ |
|---|---|
| Signature of Judge | Date |